# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

ARIEL FRIEDLER,

      Plaintiff,

v.

GENERAL SERVICES ADMINISTRATION, *et al.*,

      Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

No. 15-cv-2267 (KBJ)

</td></tr>
</table>

## MEMORANDUM OPINION

At all times relevant to this opinion, Plaintiff Ariel Friedler was the founder and sole shareholder of Symplicity Corporation ("Symplicity"), a company that provides software solutions and information-management services to colleges, universities, and all three branches of the United States government. (*See* Compl., ECF No. 1, ¶¶ 6, 8.) From 2007 until 2014, Friedler was also Symplicity's President and CEO. (*See id.* ¶ 6.) On September 4, 2015, Defendants United States General Services Administration ("GSA") and Maria C. Swaby, GSA's Suspension and Debarment Official ("SDO" and, collectively, "Defendants"), debarred Friedler from all federal contracting for nearly four years for what appeared to be three distinct reasons. (*See* Letter from Maria Swaby to Ariel Friedler (Sept. 4, 2015) ("Final Debarment Notice"), Admin. R. ("A.R.") 1085–89.)[1] The Final Debarment Notice stated, among other things, that Friedler had

---

[1] Defendants have submitted the administrative record in this matter in both hard copy and electronic format. (*See* Notice of Filing, ECF No. 34.) In this Memorandum Opinion, the page-number citations to materials contained in the administrative record refer to the Bates numbers that are stamped on the submitted materials.

(1) been convicted of a crime (*see id.*, A.R. 1085–86 (referring to his 2014 conviction

for Conspiracy to Access a Protected Computer Without Authorization, in violation of

18 U.S.C. §§ 371 and 1030)); (2) violated Swaby's directive that he remain physically

absent from Symplicity's offices during a period of suspension that GSA had imposed

as a result of his conviction (*see id.*, A.R. 1086–88); and (3) breached a specific

agreement not to perform government-related work while he was suspended (*see id.*,

A.R. 1088–89).  In the instant one-count complaint, Friedler maintains that Defendants'

decision to debar him was arbitrary, capricious, and in violation of the law under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, because he was not given

notice of all of the grounds for his debarment and an opportunity to respond to each of

them prior to the agency's final debarment determination.  (*See* Compl. ¶¶ 47–49.)

Before this Court at present are the parties' cross-motions for summary

judgment.  (*See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 28; Mem. in Supp. of

Pl.'s Mot. ("Pl.'s Mem."), ECF No. 33; Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."),

ECF No. 31.)  In his motion, Friedler argues, *inter alia*, that his debarment was

procedurally infirm because the Final Debarment Notice included two "new causes"

(apart from his criminal conviction) that were raised for the first time in the context of

that announcement.  (*See* Pl.'s Mem at 7, 32–34).[2]  Defendants counter that Friedler was

afforded ample opportunity to oppose all of the charges against him, and that the two

additional grounds referenced in the Notice were not really new "causes" for

debarment; instead, Defendants say, these references were merely additional findings of

_____

[2] Page-number citations to the documents the parties have filed refer to the page numbers that the
Court's electronic filing system automatically assigns.

fact that served to extend the term of the debarment that Friedler received as a result of his conviction. (*See* Defs.' Mem. at 40–41.) New grounds aside, Defendants further argue that, because Swaby was free to debar Friedler based on his prior conviction alone, the debarment determination did not violate the APA. (*See id.* at 33–35.)

For the reasons explained below, this Court finds that Defendants relied on Friedler's alleged post-conviction conduct in reaching the conclusion that he should be debarred but failed to notify him of these purported violations—a failure that is unquestionably improper under the applicable provisions of the Federal Acquisition Regulation ("FAR"). *See* 48 C.F.R. § 9.406-3. And because this Court cannot reasonably find that Defendants would have debarred Friedler on the basis of his criminal conviction alone, the Court cannot conclude that the agency's error in relying on the two additional grounds without providing notice was harmless. Therefore, Plaintiff's motion for summary judgment will be **GRANTED**, Defendants' motion for summary judgment will be **DENIED**, and the matter will be remanded to the agency for further proceedings not inconsistent with this Memorandum Opinion. A separate Order will follow.

## I.     BACKGROUND

### A.     Debarment Procedures Under The Federal Acquisition Regulation

According to the D.C. Circuit, "[d]ebarment is an administrative action which excludes nonresponsible contractors from government contracting" and "effectuate[s] the [federal government's] policy that 'agencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only.'" *Caiola v. Carroll*, 851 F.2d 395, 397, 398 (D.C. Cir. 1988) (quoting 48 C.F.R. § 9.402(a)). Title

48, Chapter 1 of the Code of Federal Regulations, which is known as the FAR, sets forth the "policies and procedures governing the debarment and suspension of contractors by agencies[.]"  48 C.F.R. § 9.400(a)(1).  The FAR makes clear that, because government contracts are awarded based on the contracting officer's "affirmative determination of [the prospective contractor's] responsibility[,]" *id.* § 9.103(b), the focus of a *debarring* official's inquiry is similarly on whether the questionable contractor can demonstrate "present responsibility[.]"  *Id.* § 9.406-1(a) (instructing that, "if a cause for debarment exists," the debarring official should assess whether the contractor can demonstrate "its present responsibility and that debarment is not necessary").

The FAR lists certain circumstances that qualify as potential causes for the debarment of a contractor, including (1) a conviction of, or civil judgment for, an "offense indicating a lack of business integrity or business honesty that seriously and directly affects [his] present responsibility[,]" *id.* § 9.406-2(a)(5); and (2) "any other cause of so serious or compelling a nature that it affects [his] present responsibility[,]" *id.* § 9.406-2(c).  The FAR also indicates that a debarring official can take into account various facts that demonstrate a contractor's present responsibility notwithstanding the existence of a cause for debarment; these considerations include whether "the contractor brought the activity cited as a cause for debarment to the attention of the appropriate Government agency in a timely manner"; whether "the contractor cooperated fully with Government agencies during the investigation and any court or administrative action"; and whether "the contractor has implemented or agreed to implement remedial measures, including any identified by the Government."

*Id.* § 9.406-1(a). Thus, "[t]he existence of a cause for debarment . . . does not necessarily require that the contractor be debarred[,]" *id.*, and the FAR itself cautions that this "serious" sanction should be "imposed only in the public interest for the Government's protection and not for purposes of punishment[,]" *id.* § 9.402(b).

Given the severity of the debarment sanction, an agency official who is considering the debarment of a contractor must satisfy certain pre-debarment procedural requirements that are "consistent with principles of fundamental fairness." *Id.* § 9.406-3(b)(1). The FAR generally requires each contracting agency to "establish procedures governing the debarment decisionmaking process[,]" *id.*, but section 9.406-3 also lays out a particular process that an agency must follow with respect to every contractor whose debarment is being considered. *See id.* § 9.406-1(a) (mandating that the debarring official must "us[e] the procedures in [FAR] 9.406-3" to debar a contractor for any of the established causes). Chief among these procedural requirements is the mandate that, with respect to any and all debarment actions, "[a] notice of proposed debarment shall be issued by the debarring official[.]" *Id.* § 9.406–3(c); *see also Popal v. Fiore*, No. 11-cv-801, 2011 WL 6826176, at *1 (D.D.C. June 17, 2011) ("When debarment is being proposed, a notice *must* be sent to the contractor informing it and giving the reasons why the action is being considered." (emphasis added)). And the FAR goes further—it specifies that the required notice of proposed debarment "shall" advise the contractor of the following specific information:

(1) That debarment is being considered;

(2) Of the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the conduct or transaction(s) upon which it is based;

(3) Of the cause(s) relied upon under 9.406–2 for proposing debarment;

(4) That, within 30 days after receipt of the notice, the contractor may submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment, including any additional specific information that raises a genuine dispute over the material facts;

(5) Of the agency's procedures governing debarment decisionmaking;

(6) Of the effect of the issuance of the notice of proposed debarment; and

(7) Of the potential effect of an actual debarment.

48 C.F.R. § 9.406-3(c). A contractor who has received the requisite notice of proposed debarment "must be allowed to submit 'information and argument in opposition to the proposed debarment.'" *Popal*, 2011 WL 6826176, at *1 (quoting 48 C.F.R. § 9.406-3(b)(1)). And this opportunity is crucial, because the FAR establishes that "if a cause for debarment exists, *the contractor* has the burden of demonstrating, to the satisfaction of the debarring official, its present responsibility and that debarment is not necessary." 48 C.F.R. § 9.406-1(a) (emphasis added).

If there is a genuine dispute of material fact regarding a proposed debarment that is not based on a conviction or civil judgment, the agency must afford the contractor a hearing. *See id.* § 9.406-3(b)(2)(i) (describing the circumstances under which the agency must provide "an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents"). However, whether or not a hearing is held, the debarring official must ultimately review all relevant evidence and make a prompt determination regarding whether or not to proceed with the final debarment. *See id.* § 9.406-3(d)(2)(i) (in cases where an evidentiary hearing is held, the debarring official reviews written findings of fact, any information and argument submitted by the contractor, and any other information in the administrative record); *id.* § 9.406-3(d)(1) (when the evidentiary hearing requirement

does not apply, the debarring official must base her decision on "all the information in the administrative record, including any submissions made by the contractor"). Finally, if the debarring official determines that final debarment is to be imposed, the contractor must be "given prompt notice" in the form of a written statement that "[r]efer[s] to the [earlier] notice of proposed debarment[,]" "[s]pecif[ies] the reasons for debarment[,]" and "[s]tat[es] the period of debarment[.]" *Id.* § 9.406-3(e)(1).

Significantly for present purposes, the FAR also instructs that, while a debarment "[g]enerally . . . should not exceed 3 years," *id.* § 9.406-4(a)(1), "[t]he debarring official may extend the debarment for an additional period" but only "if that official determines that an extension is necessary to protect the Government's interest[,]" and "solely on the basis of . . . facts and circumstances" that are separate and distinct from those "upon which the initial debarment action was based[,]" *id.* § 9.406-4(b). The regulations also make crystal clear that the FAR's various procedural mandates— including the notice and hearing requirements described above—apply equally regardless of whether an initial debarment term is being imposed or the debarring official is issuing an 'extended' term of debarment. That is, although the FAR authorizes a debarring official to extend a contractor's debarment term for an "additional period" under certain circumstances, the regulations specifically state that, "[i]f debarment for an additional period is determined to be necessary, *the procedures of [FAR] 9.406-3 shall be followed* to extend the debarment." *Id.* (emphasis added).

**B.    The Facts Underlying This Case**

Friedler first conceived of Symplicity in his freshman dormitory at Northwestern University in 1996; the company is now a Delaware corporation with some 150 employees that service major contracts with private colleges and universities, all three

branches of the federal government, and various components of state governments. (*See* Compl. ¶¶ 6–8; *see also* Symplicity's Government Business, A.R. 47–49.) The company's growth came under Friedler's careful stewardship. That is, Friedler is not only Symplicity's founder, he was also at times its sole shareholder, President, and CEO (*see* Compl. ¶ 6), and over the years, he has "overs[een] nearly every aspect of Symplicity's operations" (*id.* ¶ 9). Friedler also "invented nearly every product that the [c]ompany has sold[,]" and has been the "driving creative force behind each of" the company's new product offerings. (*Id.*) The instant case arises from the events that preceded GSA's decision to debar Friedler (but not Symplicity) from government contracting, and the procedures that the agency followed when reaching its debarment determination. The pre-debarment period spanned several years and involved many twists and turns, the most pertinent parts of which are recounted below.

1.      Friedler's Criminal Conviction And Initial Contact With GSA

It is undisputed that over a period of four years—from October of 2007 until October of 2011—Friedler illegally conspired with others to access password-protected computers without authorization in order to obtain information about Symplicity's business competitors in furtherance of his and his company's commercial and financial interests. (*See* Statement of Facts, A.R. 144–45.) Based on suspicions of such wrongdoing, the Federal Bureau of Investigation ("FBI") conducted a search of Symplicity's Virginia headquarters and a data center hosting Symplicity's servers in early March of 2012 (*see* Letter from Fred Levy and Todd Canni to Maria Swaby (Aug. 11, 2014) ("Suspension Letter Response"), A.R. 484; *see also* Aff. in Supp. of Search Warrants, A.R. 8–29), and a criminal information was subsequently filed against Friedler (*see* Criminal Information, A.R. 290–98). Friedler first met with GSA

debarment officials in July of 2012, a few months after the FBI's raid. During this initial meeting, Friedler discussed the pending criminal investigation and the allegations contained in the search warrant affidavit with Swaby and other GSA personnel (*see* Suspension Letter Response, A.R. 485), but GSA opted to take no action against Friedler or Symplicity, and the agency continued to award government contracts to the company (*see id.*, A.R. 490).

Two years later, in April of 2014, Friedler agreed to plead guilty to one count of conspiracy to access a protected computer without authorization, in violation of 18 U.S.C. §§ 371 and 1030. (*See* Plea Agreement, A.R. 527–37; *see also* Criminal Information, A.R. 290–98.) Then, a complex series of negotiations between GSA and Friedler—on behalf of both Symplicity and himself—ensued, the goal of which was to determine the extent to which Friedler and/or the company would be excluded from government contracting as a result of Friedler's criminal conviction. At one point shortly after Friedler signed the plea agreement (but before it was formally entered in court), Symplicity sent Swaby a letter, through its legal counsel, proposing that the business separate itself from Friedler. (*See* Letter from Angela Styles to Maria Swaby (May 12, 2014), A.R. 506–11.) Importantly, Symplicity's letter represented that such a severance could be accomplished by taking various formal steps, including (1) terminating Friedler's role as an officer and director of the company; (2) appointing a new CEO; and (3) implementing a Voting Trust Agreement whereby Friedler would surrender control of his shares in Symplicity to a Voting Trustee. (*See id.*, A.R. 506, 509–10.) The letter also proposed that Symplicity enter into an Administrative Compliance Agreement ("ACA") with GSA, and it attached the terms of a proposed

contract pursuant to which Symplicity would require Friedler to remain separated from the company for three years and prohibit Symplicity employees from seeking or taking direction from him.  (*See id.*, A.R. 506, 510.)  The proposed ACA also required Symplicity to secure an external monitor to provide independent verification of Friedler's separation from the company.  (*See id.*)

Swaby met with Friedler shortly after receiving Symplicity's proposal, primarily to discuss her concern that Friedler would be unable or unwilling to abide by the proposed terms of his separation from Symplicity.  (*See* GSA Mem. re Summ. of May 19, 2014 Meeting with Ariel Friedler, A.R. 512.)  At the meeting, which took place in May of 2014, Swaby listed several conditions that she required both Friedler and Symplicity to meet as part of the proposed agreement, and she emphasized that if Friedler or Symplicity violated the conditions, both would be debarred.  (*See id.*, A.R. 513.)  For example, Swaby demanded that a truly independent Voting Trustee be appointed and that Friedler and Symplicity have no communication for the duration of any ACA.  (*See id.*; GSA Mem. re Summ. of Nov. 6, 2014 Teleconference with Friedler's Att'ys, A.R. 504.)  Swaby's concerns over the Voting Trustee's independence and Friedler's separation from the company carried into subsequent meetings as well; at one point she even instructed Symplicity and Friedler to engage an Independent Monitor in the process of appointing the trustee and verifying the trustee's independence.  (*See* Mem. re Summ. of Nov. 6, 2014 Teleconference with Friedler's Att'ys, A.R. 504.)

        2.    <u>Friedler's Suspension And Notice Of Proposed Debarment</u>

In the midst of Friedler's and Swaby's ongoing negotiations over the appointment of an acceptable Voting Trustee and the other terms of Symplicity's

proposed ACA, GSA formally suspended Friedler from doing business with the federal government pursuant to FAR 9.407-2(a)(9) and (c), on the grounds that Friedler "lack[ed] the present responsibility to be a Government contractor[.]"  (*See* Letter from Maria Swaby to Ariel Friedler (May 21, 2014) ("Suspension Letter"), A.R. 285–88.)  The only identified bases for the suspension—which took effect on the same day that Friedler's guilty plea was entered (*see* Plea Agreement, A.R. 527)—were Friedler's "alleged actions and the [resulting] Criminal Information filed against" him (Suspension Letter, A.R. 287).

In his written response to the Suspension Letter, Friedler acknowledged that Swaby intended to debar him personally for three years, but he requested an opportunity to meet with her to avoid such debarment by demonstrating his present responsibility to GSA.  (*See* Suspension Letter Response, A.R. 476.)  Several more months of negotiations over the terms of Friedler's suspension followed, after which Friedler sent Swaby a letter and a 'term sheet' that outlined his proposal:  in exchange for the revocation of his suspension by GSA, a new Voting Trustee and Independent Monitor (both subject to GSA's approval) would be retained, and Friedler would voluntarily abstain from federal government contracting for 12 months.  (*See* Letter from Fred Levy and Todd Canni to Maria Swaby (Nov. 5, 2014), A.R. 925–29.)  Swaby rejected Friedler's proposal the very next day.  (*See* GSA Mem. re Nov. 6, 2014 Teleconference with Friedler's Att'ys, A.R. 503.)  She emphasized that Friedler had failed to appoint an acceptable Voting Trustee up to that point despite his repeated promises to do so, which, in her view, evidenced the fact that he was not yet presently responsible.  (*See id.*, A.R. 505.)  Swaby also added that she would "proceed to the next stage of the

process" vis-à-vis Friedler's personal debarment (i.e., issuing a notice of proposed debarment), and that if a new Voting Trustee was not promptly appointed, Symplicity, too, would receive such a notice. (*Id.*)

A few weeks later, Swaby followed through on her threat to issue a Notice of Proposed Debarment directed at Friedler. (*See* Letter from Maria Swaby to Ariel Friedler (Nov. 26, 2014) ("Notice of Proposed Debarment"), A.R. 940–42.) The sole basis for the proposed debarment identified in the Notice was Friedler's criminal conviction and the illegal actions underlying that conviction. (*See id.*, A.R. 941.) In this regard, the Notice specifically identified two of the FAR's enumerated causes for debarment: FAR 9.406-2(a)(5), which pertains to convictions for an "offense indicating a lack of business integrity or business honesty that seriously and directly affects the [contractor's] present responsibility[,]" and FAR 9.406-2(c), which authorizes debarment for "any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor[.]" (*See* Notice of Proposed Debarment, A.R. 941.) The Notice further advised that Friedler could "submit, either in person, or in writing, or both, information and argument in opposition to the proposed debarment" within 30 calendar days, and that "[t]he determination whether or not to debar [Friedler] is discretionary and will be made on the basis of the administrative record, together with any written materials submitted for the record by the Government or [Friedler] during the period of proposed debarment." (*Id.*, A.R. 941–42).

3. The Final Debarment Notice

Friedler continued to negotiate with Swaby and GSA after the Notice of Proposed Debarment was issued. With respect to the condition that a Voting Trust Agreement be executed pursuant to which a Voting Trustee acceptable to Swaby would

be appointed (*see, e.g.*, Email from Maria Swaby to Fred Levy (Dec. 15, 2014), A.R. 1212), Friedler eventually proposed a suitable new Voting Trustee (*see* Email from Fred Levy to Maria Swaby (Mar. 25, 2015), A.R. 978), and the required Voting Trust Agreement was executed (*see* Voting Trust Agreement, A.R. 981–1036). The Voting Trust Agreement not only designated the Trustee (who received and controlled Friedler's voting rights with respect to all of his shares in Symplicity) and empowered the previously-appointed Independent Monitor to ensure that the terms of the Agreement were adhered to (*see id.*, A.R. 985–86), it also addressed—and strictly governed—Friedler's contacts with Symplicity and/or its employees. In particular, the Voting Trust Agreement specifically stated that

> [d]uring the period in which Friedler is excluded or voluntarily abstains from conducting business with the Federal Government, he is *prohibited from being present at the Corporation's offices and from communicating directly with the Corporation's employees regarding the Corporation's business*, except where the Monitor determines, in advance, that such visits and/or communications are unrelated to the Corporation's federal government contracting business and consistent with the terms of this Agreement and any Administrative Agreement that may be entered into between GSA and Friedler. *The Monitor and representatives of GSA shall have the right to be present and/or to monitor all such visits and oral communications.*

(*Id.*, A.R. 996 (emphasis added).) Thus, among other things, all communications between Friedler and Symplicity employees, written or otherwise, had to be authorized and made available for review by the Independent Monitor, and Friedler was prohibited from "communicating directly with the Corporation's employees" concerning contracts or work with the federal government. (*Id.*, A.R. 995–96.)

Once the Voting Trust Agreement and Independent Monitoring Agreement (*see* Evaluation & Monitoring Services Agreement, A.R. 1037–41) were finally in place, Friedler and GSA began negotiating the terms of one or more Administrative

Compliance Agreements ("ACAs") that would resolve Friedler's suspension, avoid his debarment, and shield both Friedler and Symplicity from further administrative action by GSA. For a time, it appeared as though those negotiations had borne fruit. In August of 2015, after several weeks of negotiations, Swaby was on the brink of executing separate ACAs with Friedler and with Symplicity, and indeed, Friedler was specifically informed that "[t]he SDO is poised to sign these ACAs on Thursday, August 13, 2015, as they are, with no edits." (Email from Sarah Drabkin to Rand Allen & Fred Levy (Aug. 11, 2015), A.R. 1050.) The draft ACA with Friedler stated that he was "presently responsible" based on his representations and submissions to GSA, and that GSA "agree[d] to terminate his proposed debarment" in exchange for his "voluntary abstention from Federally-funded work, and his compliance with this Agreement[.]" (ACA, A.R. 1050.020–021.) The ACA further concluded that the various agreements in place between GSA, Friedler, and Symplicity would sufficiently protect the interests of the government without requiring the exclusion of Friedler from federal procurement or non-procurement transactions. (*See id.*, A.R. 1050.020.) The draft ACA with Symplicity similarly stated that "Symplicity is presently responsible" and that "the interests of the Government will be sufficiently protected to preclude the necessity of excluding Symplicity from Federal procurement or nonprocurement transactions at this time." (ACA, A.R. 1050.055.) Swaby gave Friedler and Symplicity until the next day to sign and return the agreements. (*See* Email from Sarah Drabkin to Rand Allen & Fred Levy (Aug. 11, 2015), A.R. 1050.)

The process then encountered a delay:  just before the ACAs were to be executed, Friedler's counsel informed Swaby that Friedler was considering removing

Symplicity's then-CEO (William Gerety), and also that the GSA-approved Voting Trustee (Patrick Kavanaugh) intended to resign. (*See* GSA Mem. re Aug. 12, 2015 Teleconference with Fred Levy, A.R. 1052–53.) Friedler's counsel asked Swaby to execute the ACAs notwithstanding these developments, but Swaby determined that she could no longer enter into the agreements, and set a September 30, 2015, deadline for Friedler to appoint another Voting Trustee and a new CEO, if Friedler chose to replace Gerety. (*See id.*, A.R. 1053.)

The debarment-resolution process then hit yet another roadblock—one that ultimately proved fatal to Friedler's chances of avoiding debarment. During a meeting between Swaby, the Voting Trustee (still Kavanaugh), the Independent Monitor, and representatives of Symplicity (including Gerety) to discuss Friedler's compliance with the Voting Trust Agreement and Independent Monitoring Agreement, Kavanaugh informed Swaby that Friedler "was physically back at Symplicity working[,]" and Gerety confirmed that Friedler "was back at Symplicity and talking to employees." (GSA Mem. re Aug. 26, 2015 Quarterly Review Meeting with Trustee, Monitor, and Symplicity, A.R. 1063.) Kavanaugh, Gerety, and the Monitor all added that the Monitor had approved Friedler's return, and that Friedler's presence at Symplicity's offices was not prohibited under the suspension and debarment provisions of the FAR. (*See id.*) But Swaby and GSA's legal counsel were nonetheless purportedly "surprise[d]" at the news, and represented that GSA had not intended that Friedler would physically return to the office while he was still subject to suspension. (*Id.*) Swaby also maintained that Friedler *knew* he was supposed to stay away from Symplicity's offices until an ACA was signed. (*See id.*)

The final nail in Friedler's coffin came sometime during or shortly after this meeting, when Swaby learned that Friedler had also allegedly continued to develop federal government lines of business and track government-based revenue lines during the suspension period.  (*See* Statement of Material Fact (*sic*) Not In Genuine Dispute ("Defs.' Statement"), Attach. 1 to Defs.' Mem., ECF No. 31-1, ¶ 78.)  Just days later, on September 4, 2015, Swaby issued a Final Debarment Notice to Friedler, which debarred him until May 20, 2019, a date that was five years retroactive to Friedler's original suspension date of May 21, 2014.  (*See* Final Debarment Notice, A.R. 1085–89.)  *See also* 48 C.F.R. § 9.406-4(a)(2) (establishing that, "[i]f suspension precedes a debarment," the effective term of the debarment is measured from the date of the commencement of the suspension period).[3]

Like his prior Notice of Proposed Debarment, Friedler's Final Debarment Notice cited to FAR 9.406-2(a)(5) and (c) as the "cause[s]" for Friedler's debarment.  (Final Debarment Notice, A.R. 1085).  However, unlike the original Notice of Proposed Debarment, which had only cited Friedler's prior criminal conviction and the actions underlying that conviction as the sole basis for the proposed debarment (*see* Notice of Proposed Debarment, A.R. 941; *see also* Final Debarment Notice, A.R. 1086 ("On November 26, 2014, you were proposed for debarment based on your actions and criminal conviction[.]")), the Final Debarment Notice expressly set forth three different justifications for the ultimate debarment decision.  The first of those causes was the same as the sole cause set forth in the original Notice:  Friedler's conviction and

---

[3] On the same day that Swaby issued the Final Debarment Notice to Friedler, she also issued a Notice of Proposed Debarment to Symplicity.  (*See* Pl.'s Mem. at 28 ¶ 48.)

underlying actions. (*See* Final Debarment Notice, A.R. 1086.) But the second reason provided, which had not been part of the Notice of Proposed Debarment (and could not have been, given that it occurred well after that Notice had issued), was the fact that Friedler was "back physically working at Symplicity and talking to employees[,]" which the letter characterized as

> a direct, knowing, and willful violation of the terms of the Independent Monitoring Agreement, the Voting Trust Agreement (VTA), and, most importantly, your representation to the SDO that while you are excluded from doing business with the Federal Government, you would abstain from being present at Symplicity, contacting Symplicity employees, or serving as an employee, consultant, advisor, or subject matter expert, or in any similar role with regard to Symplicity, except as allowed by GSA.

(*Id.*) Third, and finally, the Final Debarment Notice stated that Friedler had "also violated your agreement not to operate in the Government space while you were either excluded or voluntarily abstaining from conducting businesses with the Government by attempting to be involved in, controlling, and influencing Federal Government business." (*Id.*, A.R. 1088; *see also id.* (citing to exchanges in which Friedler had allegedly attempted to exert influence over Symplicity's pursuit of new lines of business with the federal government, including by searching the 'FedBizOpps' contracting service, and actively tracking government-based revenue lines).)

## C. Procedural History

Friedler filed a complaint in this Court on December 30, 2015, seeking to challenge GSA's Final Debarment Notice. His one-count pleading claims that the final debarment decision was arbitrary, capricious, and otherwise not in accordance with law, in violation of the APA. (*See* Compl. ¶ 49.) The parties simultaneously filed motions for summary judgment on March 21, 2016. (*See* Pl.'s Mot.; Defs.' Mem.) Friedler's motion contends that GSA violated his constitutional and regulatory due process rights

by debarring him on the basis of two purported new causes—(1) his physical presence at Symplicity's offices, and (2) certain communications he had with the Voting Trustee—without first giving him notice of and an opportunity to respond to those causes. (*See* Pl.'s Mem. at 32–34.) Friedler further argues that the record did not support these two new causes and they were otherwise unfounded (*see id.* at 35–43), and that GSA not only failed to consider all of the relevant evidence and mitigating factors that demonstrated his present responsibility (*see id.* at 44–46), but also debarred him for punitive reasons that were unconnected to any legitimate need to protect the government (*see id.* at 46–49).

GSA's motion for summary judgment maintains that "[t]here were no 'new causes' for debarment of which [Friedler] was unaware." (Defs.' Mem. at 41.) Instead, says GSA, the Final Debarment Notice merely "refers to the additional finding that [Friedler] knowingly and intentionally violated [Swaby's] directive to remain separated from control of [Symplicity,]" and Swaby only considered this to be "additional evidence of [Friedler's] lack of present responsibilit[y]." (*Id.*) Furthermore, GSA argues, "[t]he actions referred to . . . were [merely] factors in the imposition of a longer debarment period" (Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 37, at 18), and because Swaby could have debarred Friedler "based solely upon his admission of guilt and conviction" (Defs.' Mem. at 33; *see also id.* at 35 (noting that Friedler could have been debarred "immediately based upon his conviction alone")), Friedler's argument that the debarment was arbitrary is manifestly meritless.

GSA also contends that the cited actions—including Friedler's physically working at Symplicity's offices and participating in the development of new federal

government lines of business—were supported by independent evidence that Swaby fully and fairly considered, and constituted direct violations of specific terms of the Voting Trust Agreement and of GSA's clear intent that Friedler remain separated from Symplicity's federal-government-related work during the entire term of his suspension and possible debarment. (*See id.* at 36–40.) Moreover, GSA insists that, far from being punitive, Swaby made the entirely rational and well-founded determination that Friedler's debarment was necessary to protect the federal government from the risks posed by further dealings with him. (*See* Defs.' Opp'n at 20–22.)

The parties' cross-motions for summary judgment became ripe for this Court's review on April 25, 2016. (*See* Defs.' Opp'n; Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 38; Reply Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 39; Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 40.) This Court held a hearing on the parties' motions on October 13, 2016.

## II.  LEGAL STANDARDS

### A.  Motions For Summary Judgment In APA Cases

As pertinent here, the APA entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof." 5 U.S.C. § 702. Thus, under the APA, a challenged agency action— including the debarment decision of an agency's debarring official—must be set aside if it is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A); *see also Kisser v. Cisneros*, 14 F.3d 615, 618 (D.C. Cir. 1994) ("Our review of [an agency]'s debarment decision is . . . governed by the traditional 'arbitrary and capricious' standard set forth in the APA[.]").

There is no question that "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35, 53 (D.D.C. 2015) (internal quotation marks and citation omitted). But "in cases involving review of a final agency action[,] . . . the standard set forth in [Federal Rule of Civil Procedure 56] does not apply because of the limited role of a court in reviewing the administrative record." *Otsuka Pharm. Co., Ltd. v. Burwell*, No. 15-cv-1688, 2016 WL 4098740, at *6 (D.D.C. July 28, 2016) (alterations in original) (internal quotation marks and citation omitted). Specifically, in the APA context, the court eschews identifying genuine issues of material fact, and its summary judgment inquiry is instead "limited to determining whether the agency examined the case facts and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the choice made." *Burke v. EPA*, 127 F. Supp. 2d 235, 238 (D.D.C. 2001) (internal quotation marks and citation omitted). And in doing so, the court considers "only the rationale an agency gives for its actions at the time they occur and not post hoc rationalizations by government agency counsel[.]" *Canales v. Paulson*, No. 06-cv-1330, 2007 WL 2071709, at *3–4 (D.D.C. July 16, 2007) (internal quotation marks and citation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given" (internal quotation marks and citation omitted)).

Consequently, when a court assesses a motion for summary judgment in an APA case, "[t]he entire case on review is a question of law, and only a question of law[,]" *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), and the scope of the court's review is "the whole record of the administrative action[,]" which it reviews only to determine "whether [the agency] action was arbitrary, capricious, and an abuse of discretion not in accordance with law[,]" *Caiola*, 851 F.2d at 398 (internal quotation marks and citation omitted).

**B.      Degree Of Deference Afforded To An Agency's Interpretation Of The FAR's Debarment Procedures**

Although the APA's arbitrary and capricious standard is ordinarily "[h]ighly deferential" and "presumes the validity of agency action[,]" *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000), it is well established that only minimal deference is due to GSA's interpretation of the FAR when a court undertakes to determine whether the agency followed that regulation's procedural requirements prior to imposing a debarment.  To be sure, "[i]t is axiomatic that an agency's interpretation of its *own* regulations is entitled to considerable deference[,]" but the D.C. Circuit has held that such deference is "inappropriate[,]" and that only "minimal deference" is accorded, when what is at issue is an agency's interpretation and application of the debarment regulations included in FAR 9.406.  *Caiola*, 851 F.2d at 399 (emphasis added).

The genesis of this shift in the degree of deference owed can be traced back to the origins of the FAR as a set of regulations.  The FAR itself was written and promulgated by several federal agencies—not only GSA, but also the United States Department of Defense and the National Aeronautics and Space Administration—and thus, courts do not afford the deference to a GSA interpretation of the FAR that would

be given to GSA's view of its *own* regulations. *See id.* ("The diffusion of the
interpretive authority among several agencies, and the possibility of inconsistent
interpretations, weaken the case for deference."); *see also Novicki v. Cook*, 946 F.2d
938, 941 (D.C. Cir. 1991) (explaining that "we do not defer to the agency either—at
least with respect to its interpretation of the [FAR]—because that regulation was the
joint product of, and must be interpreted by, three different agencies"). Accordingly, in
circumstances such as those presented in the instant case, "only minimal deference is
due." *MCI Worldcom, Inc. v. Gen. Servs. Admin.*, 163 F. Supp. 2d 28, 31 (D.D.C.
2001).

## III.   ANALYSIS

Friedler argues that his debarment was arbitrary, capricious, and contrary to law
because GSA violated his constitutional and regulatory due process rights when it failed
to provide him with notice and an opportunity to be heard with respect to two purported
new causes for debarment prior to the final debarment decision. (*See* Pl.'s Mem. at
32–34). As explained fully below, this Court agrees with Friedler that the actions cited
in the Final Debarment Notice as "new causes" for debarment were exactly that—i.e.,
they were new, independent reasons for GSA's ultimate decision to debar Friedler. And
this Court finds that, with respect to these two new causes, GSA disregarded the
applicable regulations that require the agency to provide notice and an opportunity to be
heard—a procedural misstep that rendered GSA's final debarment decision arbitrary
and capricious as a matter of law.

Friedler also rejects the suggestion that this procedural error was harmless
insofar as Friedler would have been debarred in any event due to his criminal

conviction. (*See* Defs.' Mem. at 33 (noting that Swaby could have debarred Friedler "based solely upon his admission of guilt and conviction").) Debarment is discretionary under the FAR, and it is not at all clear from the instant record that Swaby would have debarred Friedler based on his criminal conviction standing alone; indeed, the lengthy record of negotiations between GSA and Friedler regarding potentially staving off debarment despite his conviction strongly suggests otherwise. Thus, as discussed at length below, GSA's debarment decision must be set aside.

A.  **GSA Failed To Provide Friedler With Notice And An Opportunity To Respond To All Of The Cited Reasons For His Debarment, Which Rendered The Agency's Debarment Decision Arbitrary And Capricious In Violation Of The APA**

There is no dispute that GSA did not issue a specific written notice to Friedler alerting him prior to his debarment that his alleged return to Symplicity's offices and his continued development of new federal government lines of business were grounds upon which the agency was contemplating his exclusion from government contracting. What is at issue here is whether GSA was *required* to notify Friedler of these potential reasons for debarment, and provide him with an opportunity to respond to them, prior to issuing the Final Debarment Notice, and *that* issue turns in significant part on the parties' differing interpretations of the alleged "new causes" for debarment that GSA cited. Friedler maintains that the language in the Final Debarment Notice is "unambiguous and controlling" (Pl.'s Reply at 5), and that, had he received the requisite notice and opportunity to respond, he could have demonstrated to GSA that his post-suspension conduct did not violate his agreement with the agency (*see* Pl.'s Opp'n at 10–16). By contrast, GSA contends that the purported new causes were not actually

new reasons for debarment at all, but rather were merely "additional evidence of [Friedler's] lack of present responsibilit[y]." (Defs.' Mem. at 41.)

The precise language that GSA used in the Final Debarment Notice is revisited in detail below. It is this Court's view that, when read in context and properly understood, the Final Debarment Notice plainly sets forth new and independent reasons for the agency's decision to debar Friedler, and importantly, the final debarment notification constituted the agency's *first* notice to Friedler of those violations. Under the FAR and GSA's established practices, Friedler was entitled to know about and have the chance to respond to these specific allegations before he was debarred, and per the regulations, this was so even if these "new causes" were merely being asserted to justify an extension of the debarment period that Swaby would have otherwise imposed based on Friedler's conviction alone. Thus, the agency failed to afford Friedler the required procedural process, rendering its debarment decision with respect to him arbitrary and capricious in violation of the APA.

            1.     <u>Friedler's Debarment Was Based On New And Independent Causes Of Which He Had No Notice</u>

Most of GSA's five-page Final Debarment Notice expressly concerns "[t]he basis for [Friedler's] debarment[.]" (Final Debarment Notice, A.R. 1085.) Swaby's letter begins by referencing the Notice of Proposed Debarment that had previously been sent to Friedler, followed by the statement that, "[a]fter careful consideration of the information contained in the record in this matter, I have determined that cause for debarment exists pursuant to [FAR] 9.406-2(a)(5) and 9.406-2(c)[.]" (*Id*.) Swaby then proceeds to explain the "basis for [Friedler's] debarment[,]" which, according to the letter, "is as follows[.]" (*Id.*)

The three brief paragraphs that next appear comprise the first cause for debarment. Swaby notes that Friedler was suspended based on the "Criminal Information" filed against him and his resulting "convict[ion,]" and she describes the sentence that the United States Court for the Eastern District of Virginia imposed in that case, along with the fact that Friedler had been "proposed for debarment based on [his] actions and criminal conviction[.]" (*Id.*, A.R. 1085–86.) The entire recitation relating to Friedler's conviction spans less than half a page of the five-page Notice. (*See id.*)

Swaby's letter then moves on to describe a series of meetings, interactions, and agreements involving Friedler that occurred long after the November 2014 Notice of Proposed Debarment was issued; this account is laid out in nine paragraphs that span more than three pages of the Notice. (*See id.*, A.R. 1086–89.) To start, Swaby describes how she learned, during the meeting of August 26, 2015, that Friedler was "back physically working at Symplicity and talking to employees." (*Id.*, A.R. 1086.) She quotes long passages from the Independent Monitoring Agreement, the Voting Trust Agreement, and what appear to be her notes from several meetings concerning the negotiated restrictions on Friedler's activity, citing them as evidence that, among other things, Friedler was "prohibited from exerting influence and control over Symplicity"; "GSA was never notified that [Friedler] intended to physically work at Symplicity" and "has never allowed nor approved of" that practice; and Friedler "*knew* that the GSA SDO prohibited [him] from exerting influence or control over Symplicity and physically working at Symplicity[.]" (*Id.*, A.R. 1087 (emphasis added).) With respect to this particular series of accusations, the letter charges that Friedler's "knowing, willful, and

intentional violation of the SDO's directives for you to remain separated from Symplicity and its employees and not to exert control and influence over Symplicity, the CEO, the Trustee, or the employees while you [were] excluded from doing business with the Government *demonstrates a lack of present responsibility*." (*Id.*, A.R. 1088 (emphasis added).) And, most tellingly, the letter further contends that "[t]hese actions also *constitute a new cause for debarment*." (*Id.* (emphasis added).)

Swaby's letter does not end there. As a precursor to the final matter addressed, the Notice says: "In addition to the above, you have also violated your agreement not to operate in the Government space . . . by attempting to be involved in, controlling, and influencing Federal Government business." (*Id.*) As support for this contention, the letter references a "record" that purportedly details certain "suggestions [that Friedler] made to the Trustee" during his period of suspension regarding new procurement opportunities with the federal government. (*Id.*) Notably, the Notice specifically characterizes the impact that these purported suggestions and interactions had on the agency's debarment determination:

> These exchanges demonstrate your attempt to be involved in and exert management, control, and influence over Federal Government business while you were excluded. *This constitutes a new cause for debarment under FAR 9.406-2(c) and indicates a lack of present responsibility.* This is also an aggravating factor which will extend the term of your debarment, because it shows that you have insufficiently mitigated the original bases for your proposed debarment, specifically your criminal conviction and related conduct outlined in the notice of proposed debarment[.]

(*Id.*, A.R. 1088–89 (emphasis added).) Thus, Swaby's Final Debarment Notice to Friedler not only specifically describes allegedly violative conduct of Friedler's that

occurred after the Notice of Proposed Debarment issued, it also specifically characterizes this conduct as "a new cause for debarment[.]" (*Id.*, A.R. 1088.)

In the context of the instant cross-motion for summary judgment, GSA maintains that Friedler "makes too much of the term 'new' cause" as that phrase appears in the Final Debarment Notice, and that, in fact, the modifier "new" in the phrase "new causes" is "simply refer[ring] to the chronology of latest examples of [Friedler's] lack of present responsibility." (Defs.' Opp'n at 18)  But that is not what Swaby's letter says.  And the Court agrees with Friedler that the plain meaning of "new cause" as that phrase repeatedly appears in the Notice (and when it is also considered in the context of the entire administrative record) leads inexorably to the conclusion that the non-conviction-related "causes" that the letter discusses constitute new and *independent* grounds on which the debarment was based, for several reasons.

First of all, it is hard to reconcile GSA's contention that the one and only cause for debarment was Friedler's criminal conviction with the fact that the Final Debarment Notice barely mentions the conviction and primarily focuses on the additional conduct, as explained above.  (*See* Final Debarment Notice, A.R. 1085–89.)  Additionally, even if it was Swaby's view that Friedler's return to work at Symplicity's offices and continued meddling with Symplicity's federal government contracting business "demonstrate[d] a lack of present responsibility[,]" the Notice unambiguously states that this conduct *"also"* qualified as a "*new* cause for debarment."  (*Id.*, A.R. 1088 (emphasis added).)  An internal GSA memorandum to Swaby that supported her Final Debarment Notice is even more explicit:  it plainly states that Friedler's return to Symplicity's offices during the suspension period "constitutes a *second* cause for

debarment under FAR 9.40[6]-2(c)." (Post-Review Mem. for Maria Swaby, A.R. 1084.015 (emphasis added).) Thus, if Friedler's return to Symplicity's offices had truly been nothing more than an additional finding of his lack of present responsibility, what purpose did Swaby's characterization of that conduct as a "new" or "second" cause for debarment serve?

The Final Debarment Notice also explicitly casts in more than one light the interactions with the Voting Trustee that GSA determined "violated [Friedler's] agreement not to operate in the Government space" while he was suspended: the Notice states that this conduct "constitutes a new cause for debarment under FAR 9.406-2(c) *and* indicates a lack of present responsibility." (Final Debarment Notice, A.R. 1088 (emphasis added).) In this regard, the Notice conveys the especially damning nature of this particular action—i.e., it qualifies simultaneously as *both* a cause for debarment *and* a basis upon which to conclude that Friedler is not presently responsible. What is more, the Notice also cites FAR 9.406-2(c) (debarment based on any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor), which under the regulations is an enumerated, independent cause for debarment that is completely separate from FAR 9.406-2(a) (debarment based on a conviction or civil judgment). *See* 48 C.F.R. § 9.406-2(a), (c); *see also Wellham v. Cheney*, 934 F.2d 305, 309 (11th Cir. 1991) (observing that the FAR "quite clearly refer[s]" to each cause for debarment set forth in FAR 9.406-2(a), (b), and (c) as "a separate and distinct 'cause' for debarment"). Courts have long concluded that a "debarment based on a conviction or civil judgment" under FAR 9.406-2(a) is "not based solely on the same facts or circumstances as a debarment based on . . . any other

28

cause of a serious or compelling nature" under FAR 9.406-2(c), *Wellham*, 934 F.2d at 309 (internal quotation marks and citation omitted), which leads this Court to wonder, insofar as it references other conduct and cites FAR 9.406-2(c), how could Swaby's Notice reasonably be interpreted any other way?

But there's more. The Final Debarment Notice specifies that, in addition to being a new cause for debarment, Friedler's interaction with the Voting Trustee is "*also* an aggravating factor which will extend the term of your debarment, because it shows that you have insufficiently mitigated the original bases for your proposed debarment, specifically *your criminal conviction and related conduct*[.]" (Final Debarment Notice, A.R. 1088–89 (emphasis added).) This aspect of the final Notice demonstrates, first, that GSA actually treated the conduct at issue as *both* a new independent cause for debarment *and* an aggravating factor to impose a longer term of debarment, and second, that the original bases for debarment (i.e., Friedler's criminal conviction and underlying conduct) are to be distinguished from the *new* cause for debarment that was being discussed therein. All of these textual clues point in one direction: toward the conclusion that Friedler's debarment was based on his conduct beyond and apart from his conviction.

Undaunted, GSA attempts to bolster its tenuous position by arguing that it could not possibly have violated Friedler's due process rights because it is the agency's ordinary practice to afford due process to the contractors it debars. (*See* Defs.' Reply at 10 ("The fact that GSA never sent [Friedler] a new proposal for debarment letter based on this particular conduct, serves to underscore GSA's position that this conduct was considered as a continuing demonstration of [his] lack of present responsibility in this

final phase of the debarment process."); *see also* Defs.' Opp'n at 19 (arguing that "[i]f GSA were truly taking exclusionary action on a 'new cause' for debarment, [Friedler] would have received a proposal for debarment notice detailing the new cause for debarment, as this is GSA's typical practice. The record is clear that he did not.").) This reasoning is entirely circular, and is thus too clever by half. But the agency is at least right about one thing: Friedler did not receive any prior notice of the "new causes" upon which the agency purportedly based his debarment, and in this Court's view, that failure on the agency's part demonstrates GSA's *violation* of its pre-debarment procedural rules rather than the inapplicability of those procedural protections.

To be clear, this Court does find that Friedler received notice of the bases for the *proposed* debarment, and that he had ample opportunity to respond to the contention that he be disbarred on that ground. According to GSA itself, its discussions with Friedler about the impact of the FBI's investigation, his subsequent criminal conviction, and the conduct underlying that conviction on his ability to continue seeking government contracts spanned "[t]hree years[,]" involved "dozens of in-person meetings and teleconferences[,]" and included "consideration of hundreds of pages of documents[.]" (Defs.' Mem. at 33.) The record supports this characterization, but the record also demonstrates that it was just as the parties neared the finish line of their marathon negotiations that GSA suddenly reversed course and debarred Friedler without providing any advance notice of the two additional negotiation-related circumstances upon which his debarment was, at least in part, ultimately based.

Accordingly, this Court finds that there is no genuine issue regarding the fact that Friedler was never "notified of the specific charges concerning [his] alleged lack of integrity, so as to afford [him] the opportunity to respond to and attempt to persuade" Swaby and GSA that the new "allegations [were] without merit." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 968 (D.C. Cir. 1980). And Friedler insists that this lack of notice *mattered*, because the two new causes were not supported by the evidence in the administrative record (*see* Pl.'s Mem. at 35–43), and because, had he been given the chance, he would have demonstrated why GSA's conclusions were factually and legally deficient (*see* Pl.'s Reply at 7). This outcome is entirely plausible given that, as noted above, final debarment is by no means an automatic sanction, and apparently, "in a sizeable number of instances," FAR 9.406-3's due process requirements result in "the proposed debarment not being finalized." *Popal*, 2011 WL 6826176, at *1. In the instant case, however, "the reasons originally given [in the Notice of Proposed Debarment] were later modified[,]" and thus Friedler's chance to present information in connection with the original sole basis for the proposed debarment—his conviction—was "a meaningless one." *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318, 324 (6th Cir. 1981).

It is for all these reasons that this Court cannot accept GSA's argument that the two new causes were somehow covered by the prior Notice of Proposed Debarment, or should otherwise be characterized as not new causes at all, such that additional notice and an opportunity to respond was not required.

2. Even If The "New Causes" Were Merely "Aggravating Factors"
That Warranted Extension Of The Term Of Debarment, Friedler
Was Entitled To Advance Notice Of Them

GSA's alternative attempt to characterize the purported new causes mentioned in

the Notice as mere aggravating factors that "justify a longer debarment period" (Defs.'

Opp'n at 18–19) is bold, but ultimately unavailing.  This is because even if one assumes

*arguendo* that the Final Debarment Notice was really devoted to explaining why

Friedler's not-yet-imposed term of debarment would be longer than the ordinary term,

GSA would *still* have been required to provide Friedler with prior notice of the reasons

for this extension, and an opportunity to respond, under the provisions of the FAR that

expressly provide that such procedural requirements apply equally to situations where a

debarment is extended.

Specifically, and as explained above, the FAR first establishes that the period of

debarment generally should not exceed three years except under one narrow enumerated

circumstance which is not presented here.  *See* 48 C.F.R. § 9.406-4(a)(1)(i).  The

relevant FAR provision then goes on to state that "[t]he debarring official may extend

the debarment for an additional period" under certain circumstances, and it also

mandates, critically, that "[i]f debarment for an additional period is determined to be

necessary, *the procedures of [FAR] 9.406-3 shall be followed to extend the debarment*."

*Id.* § 9.406-4(b) (emphasis added).  Thus, the applicable regulation plainly establishes

that the procedural mandates of FAR 9.406-3 apply to the debarring official's decision

regarding whether or not a term of debarment should be extended.

Providing no support whatsoever, GSA argues that the "FAR 9.406-3 procedures

do not require either an additional opportunity to be heard or further due process" when

a debarment is extended.  (Defs.' Mem. at 41.)  GSA's unsupported contention

disregards the plain language of FAR 9.406-4, which does *not* say that only 'some' or 'certain' procedures shall be followed, or that the debarring agency may pick and choose which procedures to follow and which to disregard. GSA's argument also ignores the numerous cases where courts have required an agency to follow the procedural requirements of FAR 9.406-3 when the agency purports to impose debarment for longer than the standard three-year period set forth in the FAR on the basis of aggravating factors above and beyond the basis for the debarment itself. *See, e.g., Int'l Exports, Inc. v. Mattis*, No. 14-2064, 2017 WL 3025837, at *10 (D.D.C. July 17, 2017) (setting aside as arbitrary and capricious, in violation of the APA, an agency's decision to impose an "additional term" of debarment extended to 15 years based on "aggravating circumstances," where the debarring official failed to make specific findings of fact, as required by FAR 9.406-3(d)(2)(i), to address a dispute with respect to the aggravating circumstances); *see also Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153–55 (9th Cir. 1998) (holding that the Air Force was required to conduct an evidentiary hearing under the FAR after notifying one of several appellants that his debarment had been proposed for extension).

This Court also observes that reading the FAR to require procedural protections prior to debarment extensions is consistent with the purpose of FAR 9.406-3, which is not the case with GSA's interpretation. As noted, FAR 9.406-3 implements debarment procedures that are intended to be "'consistent with principles of fundamental fairness[,]'" *Popal*, 2011 WL 6826176, at *1 (quoting 48 C.F.R. § 9.406-3(b)(1)), and fundamental fairness unquestionably includes the basic right to notice and an opportunity to respond that Friedler was deprived of here. *See Textor v. Cheney*, 757 F.

Supp. 51, 59 (D.D.C. 1991) ("Principles of fundamental fairness under the FAR as well as under the Fifth Amendment require reasonable notice to the plaintiff and an opportunity to present his case."); *see also Canales*, 2007 WL 2071709, at *5 ("In addition to basic procedural rights, including notice and an opportunity to respond, the FAR require[s] the [debarring official] to take additional steps to ensure that debarment proceedings are fair and accurate and that debarment is warranted under the circumstances.").  Thus, GSA's position that the reference in the extension provision (FAR 9.406-4(b)) to "the procedures of 9.406-3" does *not* include notice of and an opportunity to respond to the reasons for an extension of the debarment term is manifestly inconsistent with the thrust of the very provision that is referenced; moreover, as a textual matter, it undermines the entire point of including any reference to FAR 9.406-3's procedures in the FAR's extension provision at all.  In other words, the argument that the basic procedural protections laid out in FAR 9.406-3 do not apply to the extensions that are contemplated in FAR 9.406-4(b) not only stands in contrast to the FAR's clear concern with a contractor's procedural rights, it also renders FAR 9.406-4(b)'s express reference to FAR 9.406-3 meaningless.  *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" (alterations, internal quotation marks, and citation omitted)).

Even setting aside the plain language and purpose of the FAR, GSA's argument that the procedural requirements in FAR 9.406-3 do not apply to debarment extensions defies logic, when the function and operation of the FAR's procedural requirements are

taken into account. The agencies that were responsible for crafting the FAR undoubtedly recognized that depriving a contractor of the right to conduct business with the federal government is a severe sanction; therefore, they imposed significant procedural prerequisites for the imposition of a debarment, including a limitation on its duration—i.e., the regulations plainly state that a debarment generally cannot exceed three years. *See* 48 C.F.R. § 9.406-4(a)(1). It is only under the provisions of FAR 9.406-4(b) that a debarment may be *extended* for a longer period of time, and while there is no prescribed limit on the length of any such extension, the regulations make clear that the extension must be based on additional facts and circumstances beyond those that supported the initial debarment. *See id.* § 9.406-4(b). This all means that the FAR's provisions necessarily imply that a debarment extension can only be imposed if due process protections are afforded. That is, given that the initial three-year debarment period is only authorized if certain findings of fact are made and after the prescribed procedural protections are provided, the FAR's drafters *must* have intended for procedural protections to be afforded to a contractor who is potentially facing an unlimited extension of the debarment period based on new, additional facts and circumstances (as the FAR expressly states), or it would be far too easy for an agency to rely on purported new developments to circumvent the regulatory limits on its debarment authority.

Stated a different way, GSA's reading creates a world in which an agency must make certain findings and provide full procedural safeguards before debarring a contractor for a period of up to three years, but the agency could then extend the debarment for an unlimited duration, without giving the contractor any notice of the

new facts that are the basis for the extension or an opportunity to respond to whatever additional causes purportedly supported its imposition. It is not too difficult to imagine that the easiest route for an agency operating under those circumstances would be to provide notice of one reason for debarment initially, and then purportedly 'extend' that debarment based on a host of circumstances that were not previously disclosed or fully debated. But an extended period of debarment aggrieves the excluded contractor in the same manner as the initial period of exclusion, and in this Court's view, it makes no sense to conclude that the FAR's drafters intended for the regulation's extensive procedural mandates to apply only with respect to the initial limited period of debarment, and that no procedural safeguards whatsoever are required in connection with the imposition of an extended (and potentially unlimited) debarment period. *Cf. Ali v. Health & Human Servs.*, No. 97-15264, 152 F.3d 923, at *1 (9th Cir. July 6, 1998) (observing that "[b]ecause the FAR does not place any time limits on extensions of debarment . . . the Government may use this exception to impose a longer term of debarment than otherwise would be permissible[,]" and because it has "clearly sought to take advantage of the flexibility offered by this provision[,]" it "cannot now argue that the distinction between an extension and a new debarment is merely semantic").

The bottom line is this: under the FAR's plain language and scheme, the affected contractor must be notified of new causes for debarment, whether they are reasons for the imposition of an initial debarment term or reasons for extension of a debarment period. *See* 48 C.F.R. § 9.406-4(b). Here, even if there was a factual basis for Swaby's finding that Friedler's continued connections to Symplicity were aggravating facts that warranted a longer term of debarment than the three-year term

she was considering on the basis of Friedler's conviction alone (*see* Suspension Letter Response, A.R. 476 ("GSA intends to debar [Friedler] for three years")), the FAR required her to provide Friedler with advance notice of these new reasons for concluding that the five-year term of debarment she ultimately imposed was appropriate, and an opportunity to assert that any such extension was not warranted. Therefore, GSA violated FAR 9.406-4(b) when it debarred Friedler for five years without having satisfied the FAR's procedural mandates.

        3.     <u>Where, As Here, An Agency Imposes A Debarment Or Debarment Extension Without First Affording The Contractor Notice And An Opportunity To Respond To The Causes For That Decision, The Agency's Action Violates The APA</u>

One final point warrants mention. As explained above, the APA authorizes this Court to "set aside" agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A), and a court's consideration of agency action under the APA's arbitrary and capricious standard largely and primarily involves a review of the agency's conduct to determine whether "the agency has acted within its statutory authority and that [the] action was accompanied by the appropriate procedural protections and was supported by sufficient evidence[.]" *Trans-Pac. Freight Conference of Japan/Korea v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1251 (D.C. Cir. 1980); *see also Nat'l Ass'n of Recycling Indus., Inc. v. ICC*, 627 F.2d 1328, 1334 (D.C. Cir. 1980), *cert. granted, decision vacated in part sub nom.*, *Consol. Rail Corp. v. Nat'l Ass'n of Recycling Indus., Inc.*, 449 U.S. 609 (1981) (describing the first two steps of the APA's arbitrary and capricious review of an agency action as (1) "did the Agency act within its statutory authority[,]" and (2) "was there procedural due process, i.e., notice, followed by appropriate opportunity either to

comment or to participate in a hearing").  Having already determined that GSA failed to provide Friedler with the due process that its rules require under the circumstances presented here, this Court also concludes GSA's failure to adhere to the procedural requirements that its own regulations establish prior to taking the challenged action necessarily rendered that action arbitrary and capricious for the purpose of the APA.

It is clear beyond cavil that "an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  An agency "is not free to ignore or violate its regulations while they remain in effect[,]" and thus, no matter how well-reasoned or fully-articulated its decision making process is, "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Id.* (internal quotation marks and citations omitted).  Thus, where, as here, the GSA ignores its own regulations and imposes a debarment that does not adhere to the procedural due process mandates of FAR 9.406-3, it has acted arbitrarily and capriciously, no matter how well-reasoned and seemingly well-supported its ultimate conclusion might be.  *See Int'l Exports*, 2017 WL 3025837, at *10 (remanding a debarment decision to the agency for further proceedings where the debarring official failed to adhere to the procedural requirements of FAR 9.406-3, and stating that "[a]d hoc departures" from an agency's rules and regulations "cannot be sanctioned" (internal quotation marks and citation omitted)); *see also, e.g.*, *Eco Tour Adventures, Inc. v. Zinke*, No. 14-2178, 2017 WL 1386316, at *8–12 (D.D.C. Apr. 18, 2017) (holding that the National Park Service's decision to allow incumbents to amend their contract proposals was arbitrary and capricious, and thus violated the APA, because the

amended proposals were prohibited under relevant statutory provisions and the agency's own regulations); *Fuller v. Winter*, 538 F. Supp. 2d 179, 186–91 (D.D.C. 2008) (setting aside a decision of the Secretary of Navy as arbitrary, capricious, and contrary to law where the Secretary failed to comply with naval regulations that required him to address expressly the plaintiff's arguments before refusing to amend the plaintiff's naval records).

The arbitrary and capricious nature of the ultimate debarment decision in a case such as this one also stems from the fact that a debarring official, such as Swaby, is required to consider the entire record on review when she makes the debarment decision, *see* 48 C.F.R. § 9.406-3(d), and unless the contractor has an opportunity to respond to the alleged bases for debarment, that determination will be made without the benefit of the evidence and argument that the contractor could have presented if he had been given adequate notice of the potential causes for debarment and had a pre-debarment chance to present his side of the story. It is well established that an administrative decision, including the decision to impose a debarment under the FAR, "is the essence of arbitrariness" if it is not based on all relevant evidence. *Sterlingwear of Boston, Inc. v. United States*, 11 Cl. Ct. 879, 889 n.7 (1987) (citation omitted); *see also id.* at 889 & n.7 (holding a debarment under FAR 9.406-3 to be "beyond cavil arbitrary" and prejudicial where the debarring official failed to examine and consider all relevant evidence). Thus, courts have long held that a debarment under the FAR "is legal only if the contractor has been afforded full due process protections." *BMY, a Div. of HARSCO Corp. v. United States*, 693 F. Supp. 1232, 1241 (D.D.C. 1988).

**B.    GSA's APA Violation Is Not A Harmless Error, Because It Is Not Clear That GSA Would Have Debarred Friedler Based On His Criminal Conviction Alone**

Finally, GSA's alternative argument that its debarment decision should be upheld despite any due process defects because Friedler's conviction alone supported the ultimate debarment determination (Defs.' Mem. at 33 (noting that Friedler could have been debarred "based solely upon his admission of guilt and conviction")) cannot be countenanced under the circumstances presented here.  While it is true that the law permits this Court to sustain an agency's debarment decision if the Court finds that the agency would have debarred the contractor anyway based on the remaining valid grounds for debarment, *see Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006); *Alf v. Donley*, 666 F. Supp. 2d 60, 67 (D.D.C. 2009), *vacated on other grounds* (Dec. 13, 2010), the administrative record in the instant case supports no such finding.

If anything, the evidence in the record before this Court suggests that GSA would *not* have debarred Friedler absent the two new causes, or, at the very least, that it would have debarred him for no more than the general maximum period of three years. Indeed, the record demonstrates that Friedler pled guilty in April of 2014, after which more than a year of additional negotiations regarding the potential for debarment occurred.  (*See* Defs.' Mem. at 33.)  Swaby was actually "poised to sign" an agreement with Friedler that would have permitted him to avoid being debarred notwithstanding his criminal conviction in August of 2015.  (Email from Sarah Drabkin to Rand Allen & Fred Levy (Aug. 11, 2015), A.R. 1050; *see also* ACA, A.R. 1050.006 (stating expressly that Friedler was presently responsible and would not be debarred)).  And even after Friedler informed Swaby of the possibility that both Gerety (as Symplicity's CEO) and

Kavanaugh (as Voting Trustee) would be replaced, as of August 12, 2015, Swaby remained willing to implement the ACA (thereby avoiding Friedler's debarment) if Friedler appointed a new Voting Trustee, and, if necessary, a new CEO, by September 30, 2015. (*See* GSA Memo re Aug. 12, 2015 Teleconference with Fred Levy, A.R. 1052–53.)

Just three weeks later, however, and well before the September 30th deadline, GSA and Swaby suddenly reversed course and issued the final decision to debar Friedler for five years from the date of his initial suspension. (*See* Final Debarment Notice, A.R. 1085–89.) The only event that preceded this sudden reversal was that Swaby learned during the August 26th meeting that Friedler was physically back working at Symplicity (*see* GSA Memo re Aug. 26, 2015 Quarterly Review Meeting with Trustee, Monitor, and Symplicity, A.R. 1063), and that he had apparently continued to discuss developing federal government lines of business while suspended (*see* Defs.' Statement ¶ 78; Email from Randy Sawyer to Maria Swaby (July 26, 2015), A.R. 1074–1076.006). And these two circumstances were exactly the "causes" for debarment that GSA listed in its Final Debarment Notice.

Thus, GSA's argument that the Court should sustain the ultimate debarment decision because the agency "would have clearly, and did in fact, act on a valid ground for imposing the debarment—[Friedler's] conviction, which is a *prima facie* cause for debarment under the FAR" (Defs.' Opp'n at 20)—is unpersuasive. GSA is correct that a criminal conviction is a valid basis on which to impose a debarment, *see* 48 C.F.R. § 9.406-2(a), but it is also well established that if some of the causes that the agency cites for its debarment determination are invalid, a court "may nonetheless sustain the

[agency's] decision" *only* if "the agency *would clearly have acted* on [the remaining valid] ground even if the other[s] were unavailable." *Casino Airlines*, 439 F.3d at 717 (emphasis added) (internal quotation marks and citation omitted).

The record here permits no such clarity. As laid out above, the undisputed evidence establishes that Swaby was perfectly willing to forgo the debarment of Friedler—and in fact had already *decided* not to debar him, if certain prerequisites were met—notwithstanding the fact of his criminal conviction. The record also demonstrates that the clear impetus for Swaby's ultimate debarment decision was her discovery of the allegations of fact that constituted the new causes she mentions in the Final Debarment Notice, which weakens any inference that Friedler would have been debarred regardless, based on his conviction alone. And this being the case, this Court cannot say that GSA would have debarred Friedler at all, much less for a period longer than the general maximum of three years, based solely on his criminal conviction and without regard to the additional conduct that comprises the two (invalid) causes for debarment.

## IV. CONCLUSION

For the reasons explained above, this Court concludes that GSA violated its obligations under the FAR to provide Friedler with notice of and an opportunity to respond to the new independent causes on which the agency's final debarment decision was (at least in part) ultimately based. Thus, the debarment decision was arbitrary, capricious, and otherwise not in accordance with law, in violation of the APA, and because the Court cannot conclude that GSA clearly would have debarred Friedler based on the criminal conviction alone, Friedler's debarment must be set aside.

Accordingly, as set forth in the accompanying order, Plaintiff's motion for summary judgment will be **GRANTED**, and Defendants' motion for summary judgment will be **DENIED**.


DATE:  September 21, 2017                    *Ketanji Brown Jackson*
                                            KETANJI BROWN JACKSON
                                            United States District Judge